**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 15-CR-00752 |
| v. | ) | |
| | ) | Judge Matthew F. Kennelly |
| BRANDENBURGER & DAVIS, et al. | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANT BRAD DAVIS' SENTENCING MEMORANDUM**

I.  **Introduction**

On January 29, 2014, now more than six and one-half years ago, FBI agents knocked on Brad Davis' door.  That's when his journey of more than half a decade to this sentencing hearing started.  Shortly after that visit from the FBI, Brad Davis began cooperating with the government which he has continued to do through the years to today.  He signed a plea agreement with the government in December 2015, which he agreed to have publicly disclosed prior to actually pleading guilty in an effort to assist the government in other pending investigations related to the heir location services industry.  The government filed the Information for this case just before Christmas on December 23, 2015.  Brad pled guilty on June 16, 2016.  The government conducted a long-running investigation into the conspiracy that Brad Davis pled to and according to its submissions for this sentencing, the government has identified eight (8) people in addition to Brad Davis who participated in the charged conspiracy.  The government elected not to charge any of those individuals with this conspiracy, despite conduct by those individuals that was similar to Brad's (as will be discussed more below).  The government did, however, elect to charge one other

person identified as a participant in this conspiracy, but it charged that individual, Dan Mannix ("Mannix") of Kemp & Associates ("Kemp" or "K&A"), with a similar heir location "call-off" conspiracy that involved a different company. He was not charged with the conspiracy involving Brandenburger and Davis ("B&D"), the company where Brad worked and that was owned entirely by Brad Davis' father when the conspiracy started. Mannix, who did not cooperate with the government, had a similar sentencing guideline calculation to the one now before the Court for Brad Davis. He also pled guilty, almost three years after being charged. Mannix received a sentence of probation on January 23, 2020.[1] The probation office here is recommending that Brad Davis receive a sentence of probation as well. Despite that recommendation, despite the fact that the government passed on prosecuting virtually every other participant in this conspiracy, despite the fact that Brad Davis has been cooperating with the government for six years, and despite the fact that Mannix (the most similarly situated defendant to Brad Davis) was sentenced to probation even though he did not cooperate with the government like Brad Davis did, the government is asking this Court to sentence Brad Davis to 13 months of incarceration. For the reasons set forth in this memorandum, Brad Davis' version of the offense, the 18 USC § 3553 factors including, but not limited to, "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct" (a factor not discussed at all in the government's sentencing brief), and matters that will be presented at the upcoming sentencing hearing, Brad Davis respectfully requests that this Court sentence him to probation, order no restitution as agreed with the government, order a fine of $20,000, and order a $100 special assessment.

---

[1] Attached as Exhibit 1 is the transcript of the sentencing hearing for Dan Mannix. Many of the arguments put forth by the government in its sentencing memorandum here were argued in Mr. Mannix's sentencing hearing prior to the Honorable District Court Judge David Sam issuing a sentence of probation.

## II.    __Brad Davis' Background__[2]

Brad Davis was born on October 25, 1969.  PSR ¶ 70. He is currently fifty (50) years old and lives near Sacramento, California.  His father, Bill Davis, divorced Brad's mother when Brad was approximately 10 years old.  PSR ¶ 71.  Brad was reared mostly by his mother with infrequent visitation by his father.  *Id*.  Brad is married to his wife Amy.  They have been married for twenty-one years.  PSR ¶ 74.  They have two children, a son who is nineteen and a daughter who is sixteen. *Id*.  Brad obtained a bachelor's degree from the University of Oregon in 1992.  As detailed more below, Brad's background is not just the details of this case.  He has been a dedicated father, brother, son, friend, and colleague. He has been a positive contributor to his community for decades.  This is evidenced by the forty-nine (49) letters of support attached to this memorandum as Exhibit 3.

From a work standpoint, Brad began working for his father's company, B&D, in 1993 right out of college when he was just twenty-three (23) years old. PSR ¶ 93.  He started out as a researcher at the company. *Id*.  He was later promoted to Vice President in 2004. PSR ¶ 14.  For most of his working life, Brad Davis has only known the work that he did at his father's company. After he pled guilty to the instant offense, his father terminated him from B&D. PSR ¶ 93. This was in October 2016. *Id*.  Brad has worked diligently to try to rebuild his life since being terminated.  In late 2016, he started working as an independent contractor doing work as an

---

[2] Attached as Exhibit 2 is Brad Davis' Version of the Offense (referred to herein as "BDVO").  As discussed during the status hearing on August 18, 2020, counsel for Brad Davis was informed by the probation office that his version of the offense was not included in the PSR package sent to the Court.  The Court granted Mr. Davis permission to submit his version of the offense with his sentencing memorandum. Please note that on page seven of Exhibit 2 certain names were changed to initials, JL and SB, to be consistent with what is in this memorandum. The content was not otherwise changed from what was submitted to the probation officer.  In addition, consistent with the directive in paragraph 12 of the Protective Order in this case (docket entry 29), citations to any protected materials that are noted in this memorandum or Exhibit 2 relate to charged and relevant conduct of Brad Davis and therefore reference to those materials here is made in good-faith compliance with that protective order.

investigator to help locate heirs who may be entitled to inheritances. PSR ¶ 92. He continues to try to rebuild his life and to support his family in this manner and he has been doing that work for more than four years now. PSR ¶¶ 91-92.

Brad does have certain medical conditions of note, including chronic asthma and eosinophilic esophagitis which is a chronic immune system disease that has symptoms similar to reflux disease that results in chest pain and trouble swallowing. PSR ¶ 80.

He has no criminal history. PSR ¶ 65. He was released on an unsupervised appearance bond on January 26, 2016. PSR¶ 2. He has fully complied with all terms of release pending sentencing.

## III.    **PSR Corrections**

During the status hearing on August 18, 2020, counsel for Brad Davis noted that there were certain mistakes in the PSR that required corrections. These items were discussed with the probation office and most of these items were also discussed with the government. The PSR paragraphs at issue include the following:

1. For paragraph 6 (iv), it should be noted that Bradley Davis' version of the offense was prepared by Matthew Cannon of Greenberg Traurig and is dated April 30, 2020.
2. For paragraph 6 (v), it is noted that there was a telephone interview of B&D. It should also be noted that a telephone interview of Brad Davis occurred on May 19, 2020 with counsel present.
3. For paragraph 10, the PSR states that Davis and Mannix entered into an "anticompetitive agreement to eliminate competition between the companies and thereby prevent a reduction in price levels charged to heirs." That sentence left out the words "by agreeing to allocate customers" after the words "eliminate competition." That is how it is set forth in the Information. *See* Information ¶8; *see also* Plea Agmt. at ¶4(b) and the Govt's Sentencing Memo at 2.
4. For paragraph 13, the third sentence of that paragraph says, "Northern Carolina." That should say, "Northern California."
5. For paragraph 32, it is noted that there are "18 attached victim impact statements." However, two of those statements included do not pertain to this case. Accordingly, this paragraph should be amended to state 16 not 18 statements. The two statements that do not pertain to this case are from an individual with initials ME (PDF p. 64 in the PSR packet sent) and PP (PDF p. 94 in the PSR packet sent).

4

6. For paragraph 60, the Total Offense Level is not computed correctly based on probation's findings. That should be 14 not 15.

7. For paragraph 87, Mr. Davis declined to submit a urine specimen because of the complications associated with doing so during the COVID-19 pandemic. He did not simply decline.

8. For paragraph 98, Mr. Davis provided his 2016 tax return and that should be reflected.

9. For paragraph 99 (on page 24), the value of his residence is incorrect. The probation office confirmed a mistake was made. The number should be $318,000, not $3,180,000. This, in turn, changes his "Total Assets" line from $4,136,165 to $1,274,165. Similarly, this changes the "Total Net Worth" line from $3,856,165 to $994,165. For this reason, Mr. Davis disagrees with the conclusion in paragraph 101 that based on his financial profile he can pay the fine recommended by probation as that recommendation was based on erroneously including millions in assets he does not have.

10. For paragraph 105, this paragraph should account for the offense level that should have been noted in paragraph 50. This should say that his total offense level as determined by the probation office is a 14 with a sentencing guideline range of 15 to 21 months.

## IV.    **The Charged Offense**

Heir-location service providers identify heirs to estates of intestate decedents and, in exchange for a contingency fee, develop evidence and prove heirs' claims to an inheritance in probate court. PSR ¶ 8. The offense here relates to certain practices that occurred between heir-location service providers. As set forth in the Information, the conspiracy occurred between November 2003 and August 2012. *See* Information ¶ 8. The end date charged was eight years ago. The conspiracy was between B&D and K&A and involved "call-offs" and "split-agreements." PSR ¶ 10. A call-off involves agreeing to allocate potential heirs to an estate to the first company to contact an heir of an estate. *Id*. Split-agreements involve agreeing to split fees with a company that was called off. *Id.* As the evidence in discovery demonstrates, the heir-location industry had a history of "call-off" type arrangements and other territorial agreements among competitors that goes back decades. This included B&D, even before Brad Davis was at the company. In that

regard, the concepts of call-offs and split-fees that are the subject of this case did not originate with Brad Davis.[3]

## V.     Sentencing Guidelines Section 3B1.1 Role in the Offense

In Brad Davis' Plea Agreement, it was agreed that "both parties are free to argue for or oppose" applicability of United Sentencing Guidelines Section ("U.S.S.G.") 3B1.1. *See* Plea Agrmt. at ¶ 10.  The government is requesting that a four-point enhancement be applied.  The probation office found that a three-point enhancement was warranted and that is what is included in the PSR. *See* PSR ¶ 54.  In reaching its conclusion, the probation office found, "First, there is no evidence that Defendant Davis engaged in any extensive planning or organizing with respect to what, from all appearances, was a historically accepted practice.  Second, there is no evidence that Defendant Davis recruited accomplices to specifically engaged [sic] in the criminal offense.  Participants subordinate to him were established employees of B&D.  Finally, there is no evidence that Defendant Davis claimed a right to a larger share of the fruits of the crime, beyond whatever benefit the effect of anti-competitive practices like call-offs brought to his four percent ownership interest in B&D.  Defendant Davis' ownership interest in B&D was effectuated five years after the onset of the conspiracy and was received in two separate two percent gifts on dates in 2008 and thereafter."  PSR ¶ 53.[4]

---

[3] The government contends that split-fee arrangements were not part of the "traditional collusion" in the industry.  *See* Gov't Sentencing Memo at 10.  However, the government doesn't cite support for that contention.  In any event, a Memorandum of Interview for Bill Davis, Brad's father, includes a discussion by him with the government where he explains that the concept of a split-fee arrangement "dates to before" he "came into business" and he discussed an example of fee splitting where one party did not do work for another and being paid. Later in the interview, when he describes his directive to Brad to work it out with Kemp, which is discussed further below, he specifically mentioned fee-splitting in relation to working it out.  (9/18/15 MOI of Bill Davis at 11 and 17; *see also* BDVO at 3-5).  Please note that the memorandum of interview is not included with this filing, but the details are being proffered through this filing instead.  The report can be provided to the Court if it becomes necessary.

[4] As will be discussed more below, the conspiracy was, at times, loosely adhered to and often experienced what could be best described as fits and starts.  This was noticeable in 2008 and thereafter when the relationship between the companies was deteriorating, which is also around the time that Brad Davis first acquired what ultimately became a 4% ownership interest in B&D.

The government centers its analysis around the factors in Application Note 4 of § 3B1.1. However, there is no mention in the government's version of the offense or in its sentencing memorandum about the Seventh Circuit's guidance to § 3B1.1 that uses those factors to assess the "relative culpability" of each participant, which is the core of Brad Davis' argument here. In particular, "[a] defendant who is an organizer or leader of a criminal activity involving five or more participants gets a 4–level upward adjustment; a manager or supervisor receives a 3–level increase. U.S.S.G. § 3B1.1(a), (b). At the crux of this distinction and at the base of the rationale for this enhancement sits *the relative culpability of each participant* in the criminal enterprise: those who are more culpable ought to receive the harsher organizer/leader enhancement, while those with lesser culpability and responsibility receive the lesser enhancement imposed on managers/supervisors." *U.S. v. Weaver*, 716 F.3d 439, 442 (7th Cir. 2013)(emphasis added)(citations omitted).[5] In addition, "…because Guideline 3B1.1 is all about the culpability of one participant in the criminal enterprise *relative* to the culpability of other participants in the scheme, *if all participants in the criminal enterprise are equally culpable, none receive the enhancement*." *Id.* at fn 1 (citation omitted)(emphasis added). Furthermore, "[a]lthough Note 4 offered these factors to distinguish *between* organizers/leaders and managers/supervisors, we [the 7th Circuit] have, in the past, consulted these factors to decide whether Guideline 3B1.1 applies in the first place. Thus, we have used the factors to distinguish between low-level participants undeserving of any enhancement whatsoever and managers/supervisors worthy of the 3–level enhancement." *Id.* at 442-443 (emphasis in original)(citation omitted). "[W]hat is clear from the text and structure of § 3B1.1 is that distinctions exist and are matters of degree: an organizer or leader exercises more decision-making and leadership authority, participates to a larger extent in

---

[5] Brad Davis stipulated that the offense involved at least five participants. *See* Plea Agrmt. at ¶ 4(c)

the planning or organizing of the offense, and exerts a greater degree of control over others than does a manager or supervisor." *U.S. v. Colon*, 919 F.3d 510, 518 (7th Cir. 2019) (affirming conviction for drug conspiracy and money laundering but noting that the § 3B1.1 guideline enhancement was not supported by the record even though the district court noted the gravity and scale of the defendant's drug dealing and also noting that middleman status alone does not warrant a role in the offense enhancement).

As stated in his version of the offense, Brad Davis' argument here is that his relative culpability is similar to the other participants in the conspiracy and that he did not exert the type of control over others that typically accompanies application of the enhancement.[6]

With that framework in mind, § 3B1.1 Application Note 4 provides that the factors "the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." *See* U.S.S.G. § 3B1.1 App. Note 4.

### A. Origins of the Conspiracy/Decision Making Authority/Nature of Participation/Recruitment of Accomplices/Planning and Organizing/Degree of Control and Authority Exercised Over Others

Because certain facts and details related to many of the § 3B1.1 factors overlap, they are being grouped together here for discussion purposes to avoid unnecessary repetition. As an initial matter, the origins of the conspiracy are important to understand here because the origins illustrate the relative culpability of Brad Davis in relation to others in the first instance. The government repeatedly identifies Brad Davis as the person who created the conspiracy but passes over the

---

[6] If the Court disagrees with Brad Davis' argument here, then he respectfully requests that the Court find that the enhancement applied be no greater than what was recommended by the probation office.

discussion with his father by calling it a consultation. *See* Gov't Sentencing Memo at 3. There is no dispute that Brad Davis was working with others at B&D to compete against Kemp for heirs of probate estates in the Seattle, Washington area in the 2003 time period. *Id*. This led to a phone call from Dan Mannix to Brad Davis where Mannix confronted Brad Davis and expressed displeasure that B&D was working cases in the Seattle, Washington area. *Id*. In addition, as part of the call with Mannix, Mannix mentioned that K&A would start going into Northern California, where B&D had a strong presence. Brad Davis' response was that everyone was already there so the addition of Kemp would not be a big deal. *See* Exhibit 2 at 2-3 citing Brad Davis MOI 9/22-23/2014 at 25. In other words, at that point prior to the discussion with his father, Brad Davis had the culpability to compete not the culpability to conspire. This is where the discussion with his father that followed became important.[7] As noted on pages seven and eight of the government's version of the offense, the discussion that Brad Davis had with Bill Davis included Bill telling Brad to "work it out." *See* Government Version of Offense (hereafter "GVO") at 7-8. The government's version of the offense further provides, "[i]n the context of the industry historically rife with collusion, Bill acknowledged that defendant Davis would have likely interpreted such a statement to include anything up to and including collusion." *See* GVO at 7-8. What Bill Davis told the government in an interview, however, is more pointed. To be clear, Brad Davis has taken, and is taking, full responsibility for his actions which is demonstrated by him pleading guilty and cooperating. There is context, however, as to the actions he took that is relevant here.

An account of what was conveyed to the investigators by Bill Davis is included in Exhibit 2. See BDVO at 3-5. The quoted sections below are from the interview report for Bill Davis in

---

[7] At the time of the call with Mannix, Brad Davis had no ownership interest in B&D. B&D was owned 100% by his father, Bill Davis. In addition, while Brad Davis later became a Vice-President of B&D and then ultimately President of B&D in 2012, at the time of this call he did not hold those titles.

relation to an interview of him on October 27, 2014. It is understood that the interview report is not a verbatim transcription of what was asked and what was answered. Nevertheless, that interview report addresses what Bill Davis meant by "work it out" and to get along with Kemp as follows:[8]

s. then there's a call at some point after the re-entry from Dan Mannix to Brad and Dan Mannix is irate that B&D is in Seattle, doesn't want them there, Brad comes to you to report the Dan Mannix call, we understand from you, you tell Brad to work something out with K&A instead of going to war, is that accurate
b. yes
s. we're wondering what does that mean, what kind of accommodation can be worked out
b. fee splitting
s. what kind
b. call offs, could be keeping fees as high as possible, that's what most wanted throughout the business, and what we wanted
s. so the general thing you were looking for is to avoid undercutting and keep fees high
b. that's fair to say was an objective
s. any other objectives
b. I think that's it
s. do you think Brad understood your objectives, when you asked to get along, would Brad have taken get along to have meant figure out a way to not undercut and keep fees high
b. sure, I don't know how long a conversation we had about it, typically we didn't have meetings about this stuff

*See* Exhibit 2 at 3-5 citing Bill Davis MOI 9/18/2015 at 17.

Further into the interview report, the following is provided:

s. based on Brad's experience since 1993, at this point when you say "get along" would he understand that undercutting would be not getting along and going in at 12% would that be an example of not getting along
b. I think you want to keep the fees as high as you could, I don't know the Scenario [sic] that would make it a 12%, but my response is keep it as high as you can
s. but going low for the purpose of needling K&A would not be getting along
b. that's true
s. you would expect Brad to understand that based on his 10 years of experience
b. given the history of the business you could draw that conclusion
s. you didn't feel a special need to explain what get along meant
b. no
s. based on what you told him, would he have had the authority to do what was necessary for purposes of getting along

---

[8] The "s" refers to the question asked by the government and the "b" refers to the answer provided by Bill Davis. These references are reflected this way in the Memorandum of Interview.

b. yes
s. had he not had that authority would you have given it to him
b. yes
s. he didn't need your approval to reach an arrangement with K&A
b. no.  whenever I found out I would've agreed to it, I would've accepted whatever arrangement he made
s. there's a difference between him knowing that you would agree to this arrangement, and him knowing he didn't need your approval
b. he didn't need my approval
s. so he could do something and even if you disagreed, he could carry it out
b. you mean could I override him
s. I mean you could override him correct
b. I could override him
s. but ultimately he could do what he wanted
b. yes
s. and you had veto power
b. yes

*See* Exhibit 2, BDVO at pages 3-5 citing Bill Davis MOI 10/27/2014 at 17-18) (Please note that the MOI is dated 9/18/15 but the interview was on 10/27/14).

In short, Brad Davis did not initially set out to enter into a conspiracy.  He received guidance to "work it out" and to get along with Kemp, and it was clear what that meant.  He then acted accordingly.

Turning more directly to the § 3B1.1 factors, with respect to decision-making authority and the nature of participation, Brad Davis had decision-making authority, but so did the other participants in the conspiracy.  As set forth in the discovery, all of the identified "participants" could send call-offs, receive call-offs, agree to split-fee arrangements, and otherwise make decisions in relation to the conspiracy.  The government has converged Brad Davis' position in the company that had him involved in day-to-day business responsibilities as him always being involved in day-to-day conspiracy activities.  *See* GVO at 6. Because the relative culpability of participants in the conspiracy is the appropriate inquiry in analyzing these factors, the fact that the other participants could do and did do all of those acts matters for purposes of determining whether to apply the guideline enhancement.

Further to planning and organizing the offense and participation, the probation office noted that "there was no evidence that Defendant Davis engaged in any extensive planning or organizing with respect to what, from all appearances, was a historically accepted practice." *See* PSR ¶ 53. However, the government contends that Brad Davis "instructed the relevant B&D employees of the conspiracy's operation and procedures to enable them to carry out call-offs themselves ." *See* GVO at 7; *see also* Gov't Sentencing Memo at 9 (item b).  In support of this, the government cites in its version of the offense to the April 16, 2015 Memorandum of Interview for Brad Davis.  The relevant portion of that interview, however, actually provides the following, "Researchers would have direct access to K&A under Brad Davis's instruction, and weren't required to ask Brad Davis for permission to send a call-off.  Initially Brad Davis and the researchers figured out how to deal with K&A as part of a *group discussion about splitting, but eventually everyone hammered out their own deals*.  Brad Davis would have been involved early on because the deal was new, but soon the researchers would have figured out how the process worked." See BDVO at 6-7 (emphasis added).  In other words, this was a group decision that did not involve Brad Davis issuing a mandate to others to participate.  In fact, the government specifically recognized that individuals were able to determine whether to engage or not engage in the conduct.  Specifically, the Government's Version of the Offense provides, "…each B&D researcher individually stopped engaging in the anticompetitive practices (inclusive of call-offs) when their individual frustration levels with the arrangement exceeded their tolerance thresholds." *See* GVO at 6.

The description of the group meeting above is also not one that supports the idea of "recruitment," which is what the probation office found. *See* PSR ¶ 53 ("there is no evidence that Defendant Davis recruited accomplices to specifically engaged [sic] in the criminal offense.") Nevertheless, the government cites cases from other circuits for the proposition that enlisting

employees to participate is recruitment. *See* Gov't Sentencing Memo at 10-11. However, the government is missing the mark with those cases. As noted above, there was a group discussion that occurred that did not involve Brad Davis exerting control in such a manner that he was "enlisting" employees in a manner constituting recruitment, which is what the probation office found. That meeting occurred some seventeen years ago now, more than ten years before the FBI knocked on Brad Davis' door. Recollections of specifics from that meeting have certainly faded, but there is no conclusive information that Brad Davis "recruited" or controlled people at that meeting rather than have a group discussion about how to move forward as he described in an interview.

With respect to the degree of control and authority factor, it should be noted that, "[f]or purpose of § 3B1.1 then, a defendant exercises control and authority over another when he 'tells people what to do and determines whether they've done it.'" *See U.S. v. Weaver*, 716 F.3d at 443 (citing *U.S. v. Figueroa*, 682 F.3d 694, at 697 (7th Cir. 2012)). That was not what happened here. As a starting point on the issue of control, the government overstates what Brad Davis has admitted to. The government states, "The defendant has not disputed that his positions in the company enabled him to influence and exert operational control and make decisions over the employees located in B&D's headquarters and engage with competitor Company 1." *See* Gov't Sentencing Memo at 8 (citing PSR ¶ 14). However, paragraph 14 of the PSR actually states the following, "Defendant Davis was promoted to Vice President in 2004 and assumed responsibility for overseeing the core business of the company, particularly after his father underwent heart surgery that same year." That paragraph says nothing about exerting control, and certainly does not say that Brad Davis exerted control over others in the conspiracy in manner contemplated by application of § 3B1.1. Also, to the extent the government is trying to combine control of business

13

activities as being the equivalent of exerting control over other participants in the conspiracy, that is simply not what the 3B1.1 enhancement is intended to cover. However, that type of control was not exerted by Brad Davis. Further to the point, the government identified four participants in the conspiracy from K&A. There is no discovery in this case that demonstrates that Brad Davis did anything that could be construed as controlling anyone on the K&A side of this agreement.

With respect to the control and authority factor, the government further notes that "the defendant directly interceded on behalf of B&D with Company 1, or otherwise instructed his subordinates on B&D's response." *See* Gov't Sentencing Memo at 8-9 (citing PSR ¶ 19). The government's statement is premised on paragraph 19 of the PSR. Paragraph 19 of the PSR includes a reference to a particular estate that involved B&D and K&A. The documents provided in discovery related to the handling of that estate illustrate that another B&D employee, with the initials JL, was corresponding with K&A about that estate and offered to split fees on that matter. A letter from JL to K&A dated 2/1/2008 also notes that B&D offered a 20% fee agreement to the heirs, well within market rates notwithstanding the call-off agreement with K&A. On February 26, 2008, JL sent a fax to K&A informing K&A that he would be turning the case over to Brad Davis as the case manager. That letter also states that JL had most of the heirs on board. In the normal office flow at B&D, when a researcher had most or all of the heirs under contract, the case would be transferred to a case manager, whether that be Brad Davis or another individual in the office. That is what happened here. With respect to the documents related to the estate noted in the PSR, it does not appear that Brad Davis "interceded" to effectuate the conspiracy but rather was receiving the file in the normal course. It should be noted that JL sent a call-off, offered to split fees with K&A, and confirmed with K&A what heirs were signed for that estate. In other words, JL participated in conduct similar to Brad's conduct as did the two people on the K&A side

who sent and received correspondence with JL related to this estate. JL was later interviewed by investigators regarding this estate where it was noted that he confirmed that Brad Davis had discussed the estate with Mannix. However, the split fee arrangement had already been offered by JL, and that contact by Brad Davis with Dan Mannix would have happened in the ordinary course in any event. In short, this is not illustrative of the type of control needed for the enhancement to apply.

It should also be noted that JL stated in that interview that after the interactions he experienced with K&A that he was basically done dealing with K&A, which again was in 2008. The arrangement with K&A began to dwindle after this, and that is not just evident by what JL said to investigators. For example, on June 25, 2008, a B&D employee with initials SB sent a fax to K&A regarding an estate and said the following, "It is our understanding that because of the competitive nature of the cases out of Seattle we are not accepting call-offs. I wanted to clarify your position with your office after the McCaig estate. Please feel free to call with any questions." This illustrates that Brad Davis did not exert the type of control needed for the role in the offense enhancement, as participants were deciding to back off of the agreement and in the case of the fax referred to above communicate that to K&A directly (without the need for Brad Davis to be involved).

The government further notes that defendant Davis himself issued call-offs and received call-offs involving K&A in an effort to demonstrate his role in the offense. *See* GVO at 7; *see also* Gov't Sentencing Memo at 9. However, this detail needs to be considered in relation to relative culpability of the other participants. The discovery shows that the other participants in the conspiracy also received call-offs and facilitated call-offs being made, whether that be B&D participants or K&A ones. This is demonstrated above in relation to the estate noted in the PSR.

*See* PSR ¶ 19. In fact, one B&D employee who, based on an interview report, told the government that employees needed Brad Davis' approval to do call-offs also (according to the report) said that if that employee received a call-off fax from K&A that the first thing he would do is go to an employee with the initials of JL and if JL was not there then he would give it to Brad Davis. *See* BDVO at 7. In other words, there were others at B&D who were participating in the conspiracy in a manner that involved executing the conspiracy and making decisions in relation to the conspiracy similar to Brad.

Another example of this involves an email sent on June 26, 2007, by a B&D employee, not Brad Davis, informing others at B&D of fax numbers to use in relation to call-offs. *See* BDVO at 7.[9] Yet, the government contends that he is somehow more culpable because he identified a new point of contact at K&A during a time when Mannix was demoted at K&A. *See* Gov't Sentencing Memo at 9, item (c); see also PSR ¶ 16. Again, Brad Davis' actions were on par with the actions of others. They had similar relative culpability.

The government also states that, "[t]he defendant ensured that the payoffs owed to competitors for allocating heirs and not competing were properly made on those estates affected by collusion." *See* Gov't Sentencing Memo at 9, item (e); *see also* PSR ¶ 18 and GVO at 7. However, the document the government cites to for this proposition is an email involving a split fee arrangement where the fee structure was 1/4 [twenty-five percent] with a cap amount in relation to several of the heirs, *i.e.* an amount (notwithstanding the conspiracy) that was within market rates and below the industry standard of 1/3 that existed for years. Brad Davis, after receiving the email, sent an email to an employee in B&D with a note asking her to check the numbers to ensure accuracy of the information sent by K&A. *See* BDVO at 7. Again, this was normal back and forth

---

[9] The individual who sent the email is not identified as a "participant" in the conspiracy by the government.

paperwork that all of the participants did. It was also work that Brad did as a case manager on a file, just like other case managers. The relative culpability was similar.

The government also contends that the fee splitting arrangements were something newly created. *See* Gov't Sentencing Memo at 10. However, as discussed above, fee splitting arrangements were in the industry for years. *See supra* at 5-6, fn. 3. This claim does not add to the factor addressing organizing and implementing the conspiracy. More importantly, the fee-splitting was something that all of the participants in the conspiracy did. Again, relative culpability was similar among the participants.

**B.    Brad Davis Did Not Have A Claimed Right to A Larger Share of the "Fruits" of the Crime**

Multiple times in the government's version of the offense the government contends that Brad Davis would ultimately profit or was presumptively entitled to a greater claim of the conspiracy's fruits. *See* GVO at 9. It is not clear, in the first instance, that there were identifiable "fruits," which is supported by the fact that the government agreed that it would not be seeking restitution in this case. *See* Plea Agr. at ¶ 15. There also has not been any civil suits brought against B&D regarding this matter, despite the case being public since late 2015. In addition, Brad Davis' pay while at B&D remained steady over the years and there does not appear to be a link to his pay that derives from the conduct giving rise to the charge here. The discovery does not indicate that Brad Davis profited individually from the conspiracy. The government, however, asserts that Brad Davis became a 4% owner of the company during the relevant time period of the conspiracy to support its contention that he would be entitled to "fruits" of the conspiracy. *See* GVO at 9; *see also* Gov't Sentencing Memo at 11-12. This is speculative. Brad Davis' ownership interest was effectuated some 5 years after the start date of the conspiracy (and it was received in two separate 2% gifts at points in 2008 and thereafter). More importantly, this ownership interest was given as

17

a gift to Brad from his father because siblings received cash gifts from Bill Davis around the same time.  In other words, his ownership interest in the company is not linked in any way to the conspiracy and the discovery does not reflect that his ownership led to any increased "fruits" as a result of the conspiracy.  In fact, contrary to the assertion that there should be a presumption of obtaining "fruits" from the conspiracy (in addition to there not being a restitution amount) is that Brad Davis was paid more in annual salary and bonuses after the end date of the conspiracy than he was paid in virtually every year of the conspiracy.

The government cites two cases in support of its position, but both are distinguishable.  The first is a Fifth Circuit case called *U.S. v. Reissig*, 186 F.3d 617 (5th Cir. 1999).  This was a per curiam decision where the defendant was a part owner of a business that was characterized as a "sham" business that was part of a telemarketing fraud scheme. *Id.* at 618.  That's not the situation here.  B&D was not a sham business.  Also, the acquisition of the minority interest of 4% after the start of the dwindling of the conspiracy (as noted above) does not lead to the conclusion that Brad Davis as an individual received "fruits" of this offense.  The government also relies on the case of *U.S. v. Ahmad*, 2008 WL 248949 (E.D. PA, Jan. 30, 2008).  There, the court found because the defendant was an owner of a food market that he stood to profit as a result of under-reporting of taxable payroll in relation to a tax fraud even though there was no direct evidence that he would receive a larger share of the fruits of the crime.  Id. at *4.  However, while it is not clear from the opinion, it appears that the facts in *Ahmad* are not comparable to Brad Davis' situation where he obtained a very small ownership interest later in the conspiracy and where there does not appear to be any link between the conspiracy and the pay he received from B&D.  The *Ahmad* opinion also seems inconsistent with the language in note 4 of § 3B1.1 which states that the individual would have "the claimed right to a larger share of the fruits of the crime."  There is simply no

18

support for the contention that Brad Davis had a "claimed right" to a larger share of the "fruits" of the crime because of the 4% interest in B&D he acquired in 2008 and thereafter.

The government, in response to the contention that it is questionable that the conspiracy yielded any fruits for Brad Davis, also states in its brief that this issue will be addressed in Section IV A. 2 of its memorandum. *See* Gov't Sentencing Memo at 11, fn. 3. However, that section of the government's memorandum describes the government's theory as to why the government believes that there was a financial benefit to B&D, despite the fact that no restitution is being sought. *See* Gov't Sentencing Memo at 17-18. More importantly, there actually is no explanation in that section of the government's memorandum that explains how Brad Davis individually obtained "fruits" from the offense. That contention by the government is simply unsupported.

## VI. Imposition of Sentence Under 18 U.S.C. §3553

"The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth" in 18 U.S.C. § 3553(a)(2). Section 3553(a) further provides multiple factors the court shall consider which are discussed below.

### A. The Need to Avoid Unwarranted Sentence Disparities Among Defendants With Similar Records Who Have Been Found Guilty of Similar Conduct (18 USC § 3553(a)(6))

As noted in the introduction of this brief, Dan Mannix is an individual who participated in not only the conspiracy at issue here but also in a conspiracy with another company. With respect to the conspiracy with the other company, Mannix pled guilty to that conspiracy and in January of this year was sentenced to probation. *See* Exhibit 1. His guideline range was similar to that of Brad Davis. One primary difference, however, is that Brad Davis cooperated with the government. The government does not address in its sentencing memorandum this prior sentence of Mannix, which involves similar records and conduct to Brad Davis. That silence is telling. This factor

weighs heavily in favor of a probation sentence for Brad Davis in order to avoid unwarranted sentence disparities. And while this factor focuses on defendants who have been found guilty, it is still notable that so many of the participants in the conspiracy were not even charged by the government. Overall, this factor and that detail weighs heavily in favor of a sentence of probation for Brad Davis.

### B.    The Nature and Circumstances of the Offense

The nature of the offense and the circumstances that gave rise to the offense have been described above and will not be repeated here. Brad Davis also recognizes and takes seriously the duration of the conspiracy and amount of affected commerce. There are certain issues raised by the government, however, that will be addressed here. The government noted that 400 victims have been identified for this matter. Of those 400, sixteen (16) sent in victim impact statements. Those statements will be addressed at the sentencing hearing, but it is notable that one statement reflects discontent for the lawyers who handled the estate (not B&D) and that other statements reflect that people were charged a fee below 33%, *i.e.* well within the market range for these services notwithstanding the call-off arrangement. The number of victims identified here is half the number identified in the case involving Mannix. *See* Ex. 1 at 43-44.

The government also makes statements in its brief that certain victims were elderly. *See* Gov't Sentencing Memo at 16-17. However, there is nothing in the discovery that suggests that elderly individuals were somehow targeted here or that Brad Davis in particular targeted elderly individuals. The government, in the Mannix sentencing, conceded that elderly individuals were not targeted. *See* Ex. 1 at 40.

The government also contends in its memorandum that individuals were signed on at "supra-competitive" rates. However, the industry standard rate for heir location services was 33%,

20

and that was true for decades. In addition, as discussed above in this memorandum, notwithstanding the call-off arrangement, heirs were signed at rates below 33%. Importantly, the agreement between B&D and K&A did not eliminate all competition. This is why there were rates below the industry standard rate despite the arrangement. With this context, it is unclear what the real basis of the government's claim is that rates were "supra-competitive" when compared to historical norms and specific examples of rates below historical norms. As with most, if not all, antitrust conspiracy there is a desire to keep certain fees or prices higher, so that detail is not particularly unique here. However, the government speculates as to the harm that actually occurred including when it states, "The harm to victims *may* have been extensive, even if the information in hand is *insufficient* to calculate such harm with a sufficient degree of accuracy and reliability to calculate restitution." *See* Gov't Sentencing Memo at 18 (emphasis added). This issue will be addressed more at the sentencing hearing, but overall the speculative nature of this statement highlights that other 3553 factors, such as unwarranted disparities in sentencing, should carry the day here. Relatedly, the government notes that the scope of the conspiracy was extensive because it "applied to *all* cases in which B&D and Company 1 theoretically *could have* competed." *See* Gov't Sentencing Memo at 19. For context, there were a handful of states where the two companies competed. This did not involve every state in the country. In any event, there were times when the call-off arrangement was not adhered to and not in play so we know that it did not apply to all cases at all times despite what theoretically could have happened. *See*, *supra*, pp. 14-16. Finally, as noted previously, we also know that the arrangement did not eliminate competition from other heir-location service providers and that there were instances where even when there was a call-off the charged rate was at market or below.

### C.     History and Characteristics of the Defendant

As noted above, Brad Davis is fifty years old and has no criminal history.  He was released in this matter with an unsupervised appearance bond more than four years ago.  From early on, Brad Davis cooperated with the government.  He provided substantial assistance to the government. *See* Gov't Sentencing Memo at 14.  Additional details regarding his cooperation will be provided at the sentencing hearing, as this is a factor that supports the request of a sentence of probation.  Outside of the transgressions that led to this charge, Brad Davis has been an exemplary citizen.  He has been married for twenty-one years to his wife Amy, and he has been a good and dependable father to his two children.  He has also been active in his community.

Attached to this memorandum are forty-nine letters of support.  These are letters from family, friends, and colleagues.  These are individuals who know him, whether that be socially, professionally, or because he coached their kids in sports.  Some of these individuals have known Brad for decades.  They have seen the whole of him, not just the circumstances of this case.  Here is a sampling of some of the comments made about Brad:

1. "He is caring and helpful, a person who would give you the shirt off his back." M. Andersen Letter, Ex. 3 at 001.
2. "Brad's strong lifelong commitment to our friendship [45 years] is exemplified by his unwavering commitment and support to his family and children." G. Barnes Letter, Ex. 3 at 003.
3. "He cares deeply about those around him.  He always took exceptional care of his mother, constantly strived for the approval of his father and would do anything for his family and friends." A. Berryhill Letter, Ex. 3 at 004.
4. "I can say that Brad exhibited great character over the many years I have known him [42 years].  He is also a great family man and very involved with his kids and wife, Amy." R. Blickle Letter, Ex. 3 at 008.
5. "I understand that he has done some major soul searching and has mentally beaten himself up profusely over these last six plus years about this matter.  I believe he deserves forgiveness from those in his life he feels he has let down." M. Bouthillier Letter, Ex. 3 at 011.
6. "It would take a lifetime to tell you of all the happy memories, all the encouraging words, all the comfort and bravery given to us by him, all the joy, all the laughter, and all the care that he has given to all those around him . . .I don't like to speak for others

but I can confidently say that we all know that our world is better for having him in it." D. Carr (a sixteen-year-old friend of Brad's daughter) Letter, Ex. 3 at 014.

7. "In my dealings with Brad, he was always straightforward, honest, and professional. Brad helped hundreds or thousands of people receive money from relatives that they may not have known, and which they would never have been able to collect without Brad's services." D. Conrad Letter, Ex. 3 at 017

8. "In my 77 years on this earth, I think I've become a good judge of character and we'd be hard pressed to find a better role model." R. Crose (Brad's Stepdad) Letter, Ex. 3 at 022.

9. "I would describe Brad as a loyal friend who truly cares about those around him. When my wife was diagnosed with pancreatic cancer and underwent a huge surgery, Brad and Amy we[re] there for us and helped organize meals and care for our children." E. Giza Letter, Ex. 3 at 027.

10. "Brad Davis is truly one of the finest men we know. His character is exemplary, his loyalty to friends and family is renowned. He is honorable, honest, and hard-working. Our family stands behind Brad unequivocally. He is a good man." B. and S. Henderson Letter, Ex. 3 at 031.

11. "The Sacramento community has truly benefitted from his active involvement." D. Lowe Letter, Ex. 3 at 036.

12. "I cannot relay the hardship this has had on Brad and his family. The loss of friends, family and the financial security of his life and the lives of his children. Brad became sullen and no longer the gregarious person I know him to be." D. Lux Letter, Ex. 3 at 038.

13. "I feel blessed to know Brad. He has made my world better in many ways by just being in my life. I am proud to call him my friend." J. Rice Letter, Ex. 3 at 050.

14. "Mr. Davis is dedicated to his family, his friends and to his community. Even when faced with pain and stress in his own life, he consistently thinks of other[s] before himself and then acts to provide support. I am grateful that we have such a person in our community; it is a better place to live, work and raise our families because of Brad Davis." T. Schmidt Letter, Ex. 3 at 053.[10]

Overall, Brad Davis' history and characteristics warrants leniency by the Court.

The government contends that a fine and no incarceration "likely would have little impact on the Defendant." *See* Gov't Sentencing Memo at 20. This contention should be rejected. There has already been a significant impact to Brad Davis. It was more than six years ago when the FBI knocked on his door. The strain, stress, and worry has been extraordinarily taxing for him and his family for more than half a decade now. Additional details regarding the impact that has already

---

[10] Certain identifiers in the letters have been redacted in keeping with the guidance set forth in Federal Rule of Criminal Procedure 49.1

occurred will be presented at the sentencing hearing, which will demonstrate even further that a sentence of probation will serve the ends of justice.

### D.    18 USC § 3553 (a)(2)-(5) Factors

Brad Davis recognizes that the factors set forth in § 3553(a)(2)-(5) are to be considered by the Court.  Those include the need for the sentence to reflect the seriousness of the offense, promote respect for the law, to provide just punishment, to afford adequate deterrence, and to protect the public from further crimes of the defendant.  Brad Davis recognizes the seriousness of the offense and has taken responsibility for that.  He pled guilty and cooperated now for years.  The sentence he is requesting here does reflect that seriousness and promote respect for the law and a just punishment, especially when these factors are considered with the other factor to avoid unwarranted disparities in sentences.  Brad Davis also recognizes the guidance provide by the Sentencing Guidelines and related commentary regarding sentencing recommendations including the relevant conduct discussed in the PSR concerning the Cook County matter.  In addition, Brad Davis agrees with the government's assertion on deterrence that, "[t]here is therefore little need to protect the public from future crimes of the same sort by defendant."  *See* Gov't Sentencing Memo at 22-23.  From a general deterrence standpoint, the heir location investigations and prosecutions have sent a real message to that industry, and certain companies have (or will) fold soon in part because of the investigations by the government.  A clear message was sent.  Taken together with the other factors, however, it is not necessary to incarcerate Brad Davis as a sentence of probation will accomplish the goals of § 3553.  The conviction alone will impact Brad Davis for the rest of his life, create challenges for him in his area of work, and has already sent a clear message to the industry involved here.

### E. Restitution

The government agreed not to seek restitution in this case, and no restitution should be ordered. Brad Davis also incorporates by reference here arguments detailed above that address this factor and will discuss this further at the sentencing hearing.

## VII. Fine

Brad Davis requests that he be fined $20,000, as he agreed to pay at least amount pursuant to the terms of his plea agreement. *See* Plea Agmt at ¶14. This fine is no greater than necessary to achieve the goals set forth in § 3553. It should be noted that B&D has agreed to pay a $890,000 fine. Because Brad Davis has a 4% ownership interest in B&D, he will experience additional financial impact as a result of the fine to B&D. A $20,000 fine, plus that additional impact stemming from his ownership interest, will serve the ends of justice here. Also, the government highlights that Brad Davis' net worth approaches $1 million as part of the fine amount it seeks. *See* Gov't Sentencing Memo at 20. However, that net worth is accounted for significantly by retirement accounts and appreciation in a home that he has owned for years that already has a mortgage on it. More about the impact to him and his family if a greater fine amount is levied will be addressed at the sentencing hearing. Taken together, however, a fine of $20,000 is appropriate and will impact Brad Davis in a manner consistent with the ends of justice.

## VIII. Conclusion

For all of the reasons set forth in this memorandum, prior submissions, and statements to be made at the upcoming sentencing hearing, Brad Davis respectfully requests that this Court sentence him to a term of probation, order no restitution, order him to pay a fine of $20,000, and order him to pay a $100 special assessment.

Respectfully Submitted: August 24, 2020

*/s/ Matthew J. Cannon*
Matthew J. Cannon
GREENBERG TRAURIG, LLP
77 W. Wacker Drive, Suite 3100
Chicago, IL 60601
Email: cannonm@gtlaw.com
*Attorney for Brad Davis*

## <u>CERTIFICATE OF SERVICE</u>

   I hereby certify that on August 24, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will serve notice of such filing upon all the parties of record.

              */s/ Matthew J. Cannon*